Argued January 17, affirmed February 15, 1950

# GARBADE and BOYNTON *v.* CITY OF PORTLAND ET AL.

214 P. (2d) 1000

*Peter A. Schwabe* argued the cause for appellants. On the brief were Haas & Schwabe, of Portland.

*Virgil H. Langtry,* Deputy City Attorney, argued the cause for respondents. With him on the brief were Alexander G. Brown, City Attorney, and Marian C. Rushing, Deputy City Attorney, all of Portland.

A brief was filed by the following city attorneys as amici curiae: Chris J. Kowitz, Salem; James L. Hope, Astoria; Charles K. McColloch, Baker; Charles G. Schneider, Gresham; Paul L. Patterson, Hillsboro; John N. Mohr, Hood River; Carl G. Helm, Jr., La Grande; Raymond G. Wood, Oceanlake; Edgar L. Martin, Sandy; Marvin O. Sanders, Springfield; David O. Bennett, St. Helens; and Neal W. Bush, Vernonia.

Before LUSK, Chief Justice and BRAND, BELT, ROSSMAN, BAILEY, and HAY, Justices.

**BAILEY, J.**

Plaintiffs, Ted Garbade and Frank Boynton, brought this suit under the uniform declaratory judgments act (§§ 6-601 to 6-616, O. C. L. A.), against the defendants, City of Portland and the Mayor, Commissioners, Chief Inspector of Licenses, City Attorney, and Chief of the Bureau of Police of the City of Portland, for the purpose of securing a judicial declaration that twenty-two ordinances passed by the City of Portland, as amendments to ordinance No. 76398, known as the License and Business Code of the City of Portland, are unconstitutional and void. These ordinances were enacted simultaneously on April 21, 1949, and, according to the provisions thereof, were to become effective on and after July 1, 1949. They are numbered 89173 to and including 89194, and they are intended to raise revenue, which the City Council of Portland found was necessary, for the proper operation of the city for the fiscal year 1949-1950. It was estimated, at the time of their enactment, that a minimum of $1,900,000 would be realized from them.

The assailed ordinances constituted an integrated revenue raising, or taxing, program by the city. Eleven of them increased existing license fees on certain designated businesses and occupations. Some of the other eleven ordinances created new classifications, such as retail merchants, wholesale merchants, manufacturers and food processors, and levied license fees upon such new classifications on the basis of a percentage of gross revenue of such businesses; and other new classifications were created upon which fixed license fees were

placed. A detailed analysis and description of the individual ordinances is not deemed necessary for the purposes of this appeal.

On April 22, 1949, the day following the enactment of these twenty-two ordinances, the City Council enacted ordinance No. 89196, which sought to impose a general profits tax of one per cent on all businesses and a tax of one-half of one per cent on salaries, wages and commissions. This tax was in addition to those levied by the twenty-two ordinances. Immediately after its passage a referendum petition was filed against ordinance No. 89196. The City Council thereupon, and on May 5, 1949, enacted ordinance No. 89310, providing that the twenty-two ordinances would not become operative if, on or before July 1, 1949, ordinance No. 89196 "has become effective and operative." Regardless of the last mentioned enactment, sufficient signatures were procured to the referendum petition against ordinance No. 89196 to effect its reference, thereby preventing it from becoming operative on or before July 1, 1949. Thereafter, and on July 20 and 23, 1949, ordinances Nos. 89620 and 89675 were enacted. These ordinances have reference to the manner in which the twenty-two ordinances shall be administered and interpreted. Their constitutionality is attacked in the complaint but is not questioned on this appeal.

The plaintiffs brought this suit in their capacity of residents, inhabitants, citizens, and taxpayers of the City of Portland. Plaintiff Garbade is a partner in and doing business as Garbade's Bakery, and is engaged in operating four places of business within the City of Portland, as a retail merchant, in the sale of bakery goods and merchandise; and plaintiff Boynton is engaged in the operation of a single place of business in the City of Portland as a retail merchant under the

name of Frank Boynton Paint & Wallpaper Company, in the sale of paints, wallpaper and similar merchandise. Garbade is president and Boynton is a director of the Retail Trade Bureau of the City of Portland, a nonprofit association of approximately 400 individuals, firms and corporations "engaged in the business of retail merchants in the City of Portland". Plaintiffs allege that they bring this suit for themselves and on behalf of the members of said Retail Trade Bureau, "and for and on behalf of all persons resident or doing business in the City of Portland comparably and similarly situated" to themselves "and to avoid a multiplicity of similar suits."

The cause was tried on the issues raised by the complaint and the answer. The only evidence introduced was an agreed statement of facts by the litigants and exhibits consisting principally of copies of official documents. The circuit court made certain conclusions of law and based thereon "ordered, adjudged and decreed that that part of plaintiffs' complaint in which plaintiffs ask the court to find that the ordinances in question are null, void and invalid, and that part thereof which asks the court to perpetually enjoin the defendants from enforcing or attempting to enforce said ordinances be and the same is in all particulars denied". From this judgment and decree the plaintiffs have appealed.

Plaintiffs present the question of the alleged unconstitutionality of the twenty-two ordinances under four assignments of error. The first assignment reads as follows:

"The Court erred in finding that the 22 ordinances here under attack are not unconstitutional, in violation of the city charter and void on the

ground that they contain another *subject* different from and not germane to the subject of the original ordinance which they are stated by their titles to amend."

The License and Business Code, ordinance No. 76398, was passed December 18, 1941. It was a reenactment of existing ordinances, with the exception of a few matters relating to its administration. Its title is: "An ordinance to regulate and license private businesses and occupations in the City of Portland, and declaring an emergency." As enacted it contained an emergency clause. It is argued by plaintiffs that this ordinance (No. 76398) was not and could not

"be a tax or revenue measure because (1) it makes no mention of being a revenue raising measure (as specifically do the 22 amendatory ordinances) and (2) its emergency clause above quoted recites that it is 'necessary for the immediate health, peace, and safety of the City of Portland.' Had it been and were it a revenue or tax measure, it could and would not have carried an emergency clause under the prohibition of Article IX, section 1a of the State Constitution above quoted."

■ That part of article IX, § 1a of the state constitution, on which plaintiffs rely, provides: "The legislative assembly shall not declare an emergency in any act regulating taxation or exemption." This section refers only to the state legislative assembly and has no relevancy in respect to municipal legislative bodies. The authorities on which plaintiffs rely, to wit: *Roy v. Beveridge*, 125 Or. 92, 266 P. 230; *Cameron v. Stevens*, 121 Or. 538, 256 P. 395; *Thielke v. Albee*, 79 Or. 48, 153 P. 793; and *Joplin v. Ten Brook*, 124 Or. 36, 263 P. 893, do not support their contention that article IX, § 1a applies to municipalities. For instance, in *Roy v.*

*Beveridge* it was held that § 28 of article IV of the constitution, providing when an act takes effect, "has no relevancy in respect to the passage of a city ordinance". In *Cameron v. Stevens* it was held that article IV, § 1a, which extends the initiative and referendum powers to the legal voters of every municipality, "contains no prohibition upon the legislature or upon the law-making body of a city or town to declare an emergency when enacting laws which come within the purview of Section 1a, nor does any other provision of the Constitution."

Section 2-129 of the Charter of the City of Portland provides that

"No ordinance, except one making an appropriation, shall contain more than one general subject; ordinances making appropriations shall be confined to the subject of appropriations."

Article IV, § 20 of the Oregon Constitution likewise limits the contents of a statute. It provides: "Every act shall embrace but one subject and matters properly connected therewith, which subject shall be expressed in the title. * * *" We are not here concerned so much with the title of ordinance No. 76398, as originally enacted in 1941, as we are with the question whether that ordinance, as amended by the twenty-two ordinances, contains "more than one general subject".

■ In discussing the meaning of the word "subject" as used in the above quoted constitutional provision, this court, in *Lovejoy v. Portland,* 95 Or. 459, 466, 188 P. 207, observed:

"* * * The subject of the law is the matter to which the measure relates and with which it deals: 25 R. C. L. 842. The term 'subject' is to be given a broad and extensive meaning so as to allow

the legislature full scope to include in one act all matters having a logical or natural connection. The subject may be as comprehensive as the legislature chooses to make it, provided it constituted, in the constitutional sense, a single subject and not several, for the Constitution does not contain any limitation on the comprehensiveness of the subject. State v. Shaw, 22 Or. 287 (29 Pac. 1028).''

In accord with the foregoing quotation is the following statement in 50 Am. Jur., Statutes, § 194, p. 175:

"The constitutional provision prohibiting a statute from containing more than one subject or object should not be technically, strictly, or narrowly, but reasonably, fairly, broadly, and liberally construed, with due regard to its purpose. It should not be so construed so as to hamper or cripple legislation, or render it oppressive or impracticable, by a strictness unnecessary to the accomplishment of the beneficial purpose for which it was adopted, or to make laws unnecessarily restrictive in their scope and operation, or to multiply the number of laws unnecessarily, or to promote controversy in regard to the validity of legislative enactments.''

■ The two foregoing excerpts have reference to constitutional provisions relating to state legislation. The rule therein enunciated is also applicable to municipal legislation. In this connection we quote from 37 Am. Jur., Municipal Corporations, § 146, at p. 759:

"* * * The term 'subject' as used in such provisions is to be given a broad and extended meaning, so as to allow the legislative municipal body full scope to include in one act all matters having a logical or natural connection. If all parts of an act relate directly or indirectly to the general subject of the act, it is not open to the objection of plurality. To constitute duplicity of subject, an act must embrace two or more dissimilar and discordant subjects that by no fair intendment can be considered

as having any legitimate connection with or relation to each other. Matters which are apparently comprised of two distinct and separate subjects do not constitute the forbidden duplicity of subject, in the meaning of such provision, unless they are incongruous with and diverse to each other. While such a provision is mandatory, it is to be construed liberally. It is not intended nor should it be so construed as to prevent the municipal legislative body from embracing in one act all matters properly connected with one general subject. " See also in this connection 62 C. J. S., Municipal Corporations, § 415b, p. 793.

The License and Business Code and the twenty-two ordinances, amendatory thereof, were purportedly enacted under § 2-105 (a), subd. 21, of the Portland City Charter, reading as follows:

"The Council has power and authority, subject to the provisions, limitations and restrictions in this charter contained;

\* \* \*

"21. To grant licenses with the object of raising revenue or of regulation, or both, for any and all lawful acts, things, or purposes, and to fix by ordinance the amount to be paid therefor, and to provide for the revoking of the same. \* \* \*"

The authority thus conferred upon the Council was contained in the charter granted by the state legislature to the City of Portland in 1903, Spec. Laws of Oregon, 1903, p. 3, et seq., and was incorporated in and made a part of the 1913 City Charter. Portland Charter, 1914 Revision, § 34, subd. 21.

■ We shall now consider whether the assailed ordinances contain matters unrelated to the ordinance which they amend. In *Abraham v. City of Roseburg*, 55 Or. 359, 105 P. 401, it was pointed out that "under

a power to 'license and regulate' employments the license may be used as a means of raising revenue." *Lyons v. City of Portland,* 115 Or. 533, 235 P. 691, was a suit to enjoin the enforcement of that portion of the City of Portland's licensing ordinance relating to employment agencies. The title of the ordinance there involved read as follows: "An ordinance on the regulation of private business, including licenses and declaring an emergency." The court stated that the whole ordinance was not before it but that it appeared from the abstract "that it probably covers a wide range of business activities in addition to the business of employment agents." After pointing out that city ordinances, unlike legislative acts, were not strictly confined to matters specified in the title, the court said:

> "* * * the title here is broad enough to include licenses for the purpose of revenue as well as licenses regulating the conduct of a business. It is *on* the regulation of private business, including licenses, that is, in substance, it is an ordinance, among other things, on licenses, and we think it was entirely competent, under this title, to require licenses on a business, in the nature of an occupation tax or for revenue, as well as for the purpose of regulation."

It would appear from what was said in the Lyons case that the court did not there consider that "licenses on a business, in the nature of an occupation tax or for revenue, as well as for the purpose of regulation" contained more than one general subject.

It was held in *State v. Preston,* 103 Or. 631, 206 P. 304, that there could be no objection "to the validity of a statute upon the sole ground that it combines a police regulation and an exercise of the taxing power". In other words, such a statute would not contravene the

inhibition contained in § 20, article IV of the constitution, against an act embracing more than one subject.

Much reliance is placed by plaintiffs on *Vernor v. Secretary of State,* 179 Mich. 157, 146 N. W. 338. The constitution of Michigan, § 21, article V, provides that "No law shall embrace more than one object, which shall be expressed in its title." The title of the original act was as follows: "An act providing for the registration, identification and regulation of motor vehicles operated upon the public highways of this state, and of the operators of such vehicles." An attempt was made to amend that act, without changing the title, by providing a system of taxation of motor vehicles, both specific and ad valorem. It was held by the court that the original act was one for the registration, identification and regulation of motor vehicles and that the title of said act was not sufficiently broad to include the amendments thereto relating to the taxation of motor vehicles. The holding in that case is in accord with that in *State ex rel Pardee v. Latourette,* 168 Or. 584, 125 P. (2d) 750, and authorities therein cited.

The City Council, in enacting the License and Business Code, and the twenty-two ordinances amendatory thereof, was not exceeding its authority. There is conferred by the City Charter on the Council "power and authority, subject to the provisions, limitations and regulations" contained in the charter, to "grant licenses with the object of raising revenue or of regulation, or both". Section 2-105 (a), subd. 21, Portland City Charter. The general subject of the License and Business Code, as amended by the twenty-two ordinances, relates to licenses, and although said code provides for the granting of licenses with the object of raising revenue or of regulation, or both, it can not be

said that it contains "more than one general subject". It does not embrace two or more dissimilar and discordant subjects which can not reasonably be said to have any legitimate connection. The charter provision authorizing the City Council to issue licenses seems to contemplate that the same license may provide for the regulation of, and the imposition of a tax on, a business. The ordinances under attack are in accord with the requirements of the Portland City Charter, and are not violative of the Oregon Constitution. The first assignment is, in our opinion, without merit.

Plaintiffs' second assignment of error reads as follows:

"The Court erred in failing to find that the practical denial of the opportunity for the people to invoke the referendum against the 22 ordinances rendered the same unconstitutional and void."

In the agreed statement of facts, it is stipulated that the ordinances in question "were divided up into the 22 separate ordinances which were ordained by the Council for various reasons, including (a) convenience of operation since some of the amendments applied to license periods of less than a year and others did not; (b) for ease of consideration by the Council since any decision by the Council to eliminate any portion of the ordinances would probably have resulted in a misnumbering of the remaining parts if the ordinances had been included in a single ordinance, or preparation of a substitute ordinance, and also (c) because the charter of the City of Portland provides in Sec. 2-131 that no, ordinances shall be amended within one week of its final passage, except in case of an emergency ordinance." It is further stipulated that at the last general election on November 2, 1948,

there were cast 132,822 votes in the City of Portland; that the county clerk of Multnomah County found, in checking the signatures to the referendum petition filed against ordinance No. 89196, that about 77% of the signatures were valid; that 17,893 signatures to that petition were checked, and 13,648 of those checked were found valid; and that "the checking charge made to and paid by the sponsors of the petition was at approximately 10 cents per name checked."

It is plaintiffs' contention that the procedure adopted by the City Council in submitting its license program in the form of twenty-two ordinances amounted to a practical denial of an opportunity for referendum. In support of their assertion they direct attention to the number of valid signatures required to be obtained to each petition, the expense connected with the printing and circulation of the petitions, the cost to the sponsors of the petitions incidental to the checking of the signatures, and the limited time in which to procure the signatures.

Defendants, on the other hand, claim that the twenty-two ordinances embody a "plan" for raising revenue, and that there was nothing to have prevented the plaintiffs from referring the entire "plan" in a single petition. In other words, they argue that it was not necessary to circulate separate petitions against each ordinance for the reason that all of them could have been included in one petition. In support of this contention defendants rely on *Knowlton v. Hezmalhalch,* 32 Cal. App. (2d) 419, 89 P. (2d) 1109, and *Dye v. Council of the City of Compton,* 80 Cal. App. (2d) 486, 182 P. (2d) 623. Before discussing these cases we wish to call attention to certain sections of the state constitution, the Portland City Charter, and the Legislation and Elections Code of Portland relating to the referendum.

Section 2-134 of the Portland City Charter provides:

"Ordinances (a) making appropriations and the annual tax levy, (b) relative to local improvements and assessments therefor, and (c) emergency ordinances, shall take effect immediately upon their passage. All other ordinances enacted by the council shall take effect thirty days after their passage, unless a later date is fixed therein, in which event they shall take effect at such later date, subject to the referendum and subject to the provisions of section 52 (2-135) of this charter."

Section 1 of article IV of the state constitution, adopted June 2, 1902, reserves to the people power to propose laws and amendments to the constitution and to enact or reject the same, and to approve or reject any act of the legislative assembly, except laws necessary for the immediate preservation of the public peace, health or safety. And § 1a of article IV, adopted June 4, 1906, provides that "The referendum may be demanded by the people against one or more items, sections or parts of any act of the legislative assembly in the same manner in which such power may be exercised against a complete act." It is further provided in section 1a that "The initiative and referendum powers reserved to the people by this constitution, are hereby further reserved to the legal voters of every municipality and district, as to all local, special and municipal legislation, of every character, in or for their respective municipalities and districts." The manner of exercising said powers in the City of Portland has been prescribed by ordinance No. 77641, known as the Legislation and Elections Code, enacted August 6, 1942.

Referendum petitions are required to be filed with the auditor within 30 days (or in the case of a franchise ordinance, within 60 days) after passage of the ordi-

nance sought to be referred. Section 2-608 of the Legislation and Elections Code. A petition for submitting an ordinance by referendum is required to be signed by a number of legal voters equal to 10 per cent of the votes cast at the last preceding general city election. op. cit., § 2-609. Section 2-604 of said code provides:

"A full and correct copy of the title and text of the measure proposed by the initiative petition and a full and correct copy of the measure on which referendum is demanded shall be attached to such sheet or aggregate of sheets, circulated for signatures by such person, and such full and correct copy of the title and text of the measure shall be shown to the voter before his signature is attached."

We shall now consider the authorities relied upon by defendants in support of their contention that the entire twenty-two ordinances could have been included in one petition. In *Knowlton v. Hezmalhalch,* supra, the City of Fullerton, California, passed four resolutions which were described in the opinion of the court as follows:

"Under the first part of the minutes of the council meeting of July 22, 1938, the mayor stated that the council had decided to purchase the property in question for a *city hall site.* Immediately following that, and at the same meeting, a resolution was adopted setting aside the purchase price and directing the purchase of certain property, without designating the purpose of the purchase, i. e., that it was for a city hall site. If the council decided to perform a legislative act upon the statement of the mayor in an open meeting and if the minute entry designating the intention of the city council to purchase a city hall site is essentially necessary to construe the intent of the council in a subsequent resolution appropriating funds and directing the pur-

chase of property, respondent cannot complain of multifariousness. The resolution of August 2, 1938, when considered with the other resolutions, merely designates the site for a city hall. A subsequent minute resolution authorized a certain architect to proceed with plans and construction. * * *"

The court pointed out that the "appellant was obliged to adopt the form chosen by the city council in determining that the public interest of the city required that it should have a city hall; that the same should be located on the land offered for that purpose; that the offer should be accepted; that a suitable building should be erected thereon; that money belonging to the city should be appropriated and used in the construction thereof; and that when completed, the building should be occupied and used by the city officers as a city hall." The court then proceeded as follows:

"'* * * All of these separate acts constituted a declaration of a public purpose and a provision for ways and means of its accomplishment. Hopping v. Council of the City of Richmond, supra [170 Cal. 605, 150 P. 977]. If the council elected to adopt a separate resolution or ordinance for each of these acts stated, could it be rightfully said that it would be necessary to secure a separate petition and separate signatures for the purpose of submitting each of the resolutions to the people? This would be but a mechanical view of the law and would render inefficacious for any purpose the constitutional guaranty of the right of referendum."

*Dye v. Council of the City of Compton*, supra, involved the question whether the constitution of California extended "the power of referendum held by the electors of a city to sections and to parts or ordinances." The California constitution contains provisions similar to those contained in §§ 1 and 1a of

article IV of our constitution. The court pointed out that it had long been settled in that state "that the constitutional power of referendum possessed by the electors of a city is identical in character with that reserved in the Constitution by the people of the state. * * * Accordingly, we hold that the constitutional power possessed by the electors of a city extends not only to ordinances and other legislative acts, however denominated, as a whole, but also to sections and parts of those ordinances and acts."

Plaintiffs have called our attention to the case of *State ex rel. Patton v. Myers,* 127 Ohio State 95, 169, 186 N. E. 872, 187 N. E. 241, 90 A. L. R. 570, as being opposed to defendants' contention that the twenty-two ordinances could have been included in a single referendum petition. One of the questions there involved was whether two separate enactments of the state legislature could be attacked in the same referendum petition. The court, in holding that "more than one enactment cannot be placed in the same petition calling for a referendum election", said, among other things, as follows:

"The constitutional provision with reference to referendum contained in Article II, Section 1c, is far more specific and emphatic than that with reference to the initiative contained in Section 1a. In Section 1c, relating to referendum, the Constitution makers again and again reiterate that the referendum is to apply to 'any law,' to 'such law.' The singular number is used repeatedly throughout the section." 127 Oh. St. 95.

A similar observation applies with equal force to the Oregon Constitution. For instance, article IV, § 1, in referring to the exercise of the referendum power reserved to the people, speaks of: "*any act* of the legis-

lative assembly''; ''the *bill* on which the referendum is demanded''; *''any measure* referred to the people''; and in article IV, § 1a, ''sections or parts of *any act* of the legislative assembly in the same manner in which such power may be exercised against a complete *act.* The filing of a referendum petition against one or more items * * * of an *act* * * *.'' (Emphasis supplied.)

The Legislation and Elections Code uses these expressions: ''the *ordinance* sought to be referred'' (§ 2-608), and ''a petition for submitting an *ordinance* by referendum * * * '' (§ 2-609). Section 2-604 of that code provides that ''* * * a full and correct copy of the *measure* on which referendum is demanded shall be attached to such sheet or aggregate of sheets, circulated for signatures by such person, and such full and correct copy of the title and text of the *measure* shall be shown to the voter before his signature is attached.'' (Italics added.) Just how the provisions of § 2-604 could be complied with if all these twenty-two ordinances were attempted to be referred in a single petition is not apparent.

We see no resemblance between the factual situation in the Dye case and that confronted by us in the instant suit. We are not concerned with the question, involved in the Dye case, whether a section or a part of an ordinance may be referred but whether twenty-two ordinances can be referred by means of a single petition. Nor does the Knowlton case, in our opinion, support defendants' contention as the facts in that case are entirely different from those here. The resolutions involved were considered by the court as constituting one act. Moreover, the court, in that case, does not refer to the provisions of any statute, city charter, or ordinance governing the exercise of the

referendum power by municipalities in the State of California. Without knowledge of the wording of such legislation, we have no means of determining the correctness of the court's decision.

■ In Oregon neither the constitutional provisions nor the city ordinance relating to the exercise of the referendum power contemplate the placing of more than one ordinance in a single referendum petition. It is therefore our opinion that the plaintiffs could not have included the entire twenty-two ordinances in a single petition.

Had an emergency existed, the City Council could have attached the emergency clause to each ordinance. However, since no emergency was declared by the City Council, these twenty-two ordinances were all subject to referendum. The fact that the City Council might have declared an emergency does not answer the contention made by the plaintiffs that the enactment of twenty-two ordinances, instead of a single ordinance on a general subject, amounted to a virtual denial of the opportunity to invoke the referendum against the entire twenty-two ordinances, thereby rendering the same unconstitutional and void.

No one has attempted to refer the twenty-two ordinances, or any of them, to the electorate. They were passed April 21 and became effective July 1, 1949. This suit was not started until July 15, 1949. Plaintiffs now say that the procedure adopted by the City Council, in submitting its license program in the form of twenty-two ordinances, amounted to "practical denial of opportunity for referendum" because of the limited time in which to procure signatures to the petitions and the expense connected with the printing, circulating and checking of the petitions.

Eleven of the contested ordinances increased existing license fees on certain designated businesses and occupations and it was estimated that they would raise about $200,000 in revenue. It may be that many of these, and other, ordinances are satisfactory to those affected by them. Nearly three-fourths of the revenue contemplated to be raised by the twenty-two ordinances is expected to be realized from two of them, the wholesale and retail license ordinances. Apparently these two ordinances affect a great many people. If the referendum had been invoked against them the entire "plan" would have been very much weakened, if not destroyed. Plaintiffs seem to assume, without any basis therefor, that had the amendments included in the twenty-two ordinances been embraced in one amendatory ordinance the referendum would have been invoked against the single ordinance.

■ To the City Council of Portland is committed the authority, power, and duty to enact all local, special, and municipal legislation affecting the City of Portland. In carrying out this duty it has a wide latitude of discretion. It is for the City Council, and not the courts, to determine the manner in which legislation shall be enacted. There is no contention that the City Council, by a planned design, or otherwise, sought through subterfuge or chicanery to subvert and avoid the right of the electorate to refer any one, or all, of these ordinances. We know of no rule of law that requires legislative bodies to so legislate as to invite or to facilitate the exercise of the referendum. What was said in *Marr v. Fisher*, 182 Or. 383, 187 P. (2d) 966, is appropriate here. We quote:

"We see no merit in the contention that the people have been deprived of their constitutional right to invoke the referendum on the Acts in ques-

tion. Article IV, § 1a of the Constitution of Oregon provides:

" 'The referendum may be demanded by the people against one or more items, sections or parts of any act of the legislative assambly in the same manner in which such power may be exercised against a complete act.'

"Under the above provision of the Constitution, the people could have invoked the referendum against any section or part of Chapter 536 or Chapater 539, and, under Art. IV, § 1, could have invoked it against either or both of these chapters in their entirety. If the people had no desire to prevent the increased income tax exemptions from going into operative effect, they could have invoked the referendum only against that part of the Act decreasing personal income tax exemptions. Now, it may be that the legislature could have adopted a better method of legislation, but that is a matter resting within its discretion. Suffice it to say, the method adopted is not prohibited by the Constitution.

■ In our opinion the validity of these twenty-two ordinances was not affected by the manner of their enactment.

Plaintiffs' third assignment of error is thus stated:

"The Court erred in failing to find that the 22 ordinances sought to levy taxes in excess of the 6 per cent limitation imposed by Article XI, Section 11, of the Constitution of the State of Oregon and in failing to find that by reason thereof the said 22 ordinances are unconstitutional and void."

In discussing this assignment numerous references are made by both plaintiffs and defendants to the state income tax. Plaintiffs contend that there are expressions in our decisions and in the opinions of the attorney general intimating, if not directly holding, that the

revenue from income tax is within the six per cent limitation of article XI, § 11. Defendants, on the other hand, assert that the contrary ruling is found in the attorney general's opinions, and that there is nothing in the Oregon decisions to support plaintiffs' contention. We shall therefore, in discussing this assignment, refer to the income tax law at some length since both plaintiffs and defendants seem to be of the opinion that the six per cent constitutional limitation is equally applicable to the revenue from licenses and from income taxes.

Article XI, § 11, of the Oregon Constitution was proposed by initiative petition and adopted at the general election on November 7, 1916. As originally adopted, it read, as far as material here, as follows:

"Section 11. Unless specifically authorized by a majority of the legal voters voting upon the question neither the State nor any county, municipality, district or body to which the power to levy a tax shall have been delegated shall in any year so exercise that power as to raise a greater amount of revenue for purposes other than the payment of bonded indebtedness or interest thereon than the total amount levied by it in the year immediately preceding for purposes other than the payment of bonded indebtedness or interest thereon plus six per centume thereof * * * .

"* * * and any part of any levy of taxes made by the State or any county, municipality, or other taxing district or body which shall exceed the limitations fixed hereby shall be void." General Laws of Oregon, 1917, p. 12.

There appeared in the official voters' pamphlet an argument in support of the measure but none against it. The affirmative argument, which was by the

sponsors of the measure, as far as pertinent here, reads as follows:

> "The purpose of the 'State Wide Tax Limit Amendment' is to limit the increase in taxation to an annual increase not to exceed 6% a year unless a greater increase is authorized by the people. In other words if a man's taxes are $100 this year they can't be more than $106 next year unless the greater increase is authorized by the people. It means that Oregon can continue to spend all the money she is now expending and can increase it 6% a year; but if our public officials wish to increase it at a faster rate they must get the authority of the voters.

> "If you feel that your taxes are high enough now and that they should not increase faster than 6% a year in the future unless the voters authorize a greater increase you will support this measure."

In 1932, § 11 was amended by deleting the words "the year", after the phrase, "the total amount levied by it in", and adding in lieu thereof the following: "any one of the three years". General Laws of Oregon, 1933, p. 6.

At the time of the adoption of article XI, § 11, there had been considerable agitation for an income tax but no legislation had been enacted providing for such a tax. At the general election in November, 1912, the electorate of the state voted against a proposed amendment to article XI of the constitution which provided that taxes might be imposed on income. At the general election in 1922, the electorate defeated a proposed income tax measure submitted by initiative petition. The 1923 legislative assembly enacted an income tax law, Ch. 279, Oregon Laws, 1923, against which the referendum was invoked, and at the special election in November of that year the measure received the approval of the voters of the state. At the general election in 1924 the voters repealed the income tax meas-

ure which had been approved by them at the special election in November, 1923. Again, at the general election in 1926, two income tax measures, submitted by initiative petitions, were voted upon and defeated.

The income tax having become a live issue, the legislature in 1927 submitted a proposal to amend the constitution by adding thereto a section to be numbered and known as section 11a, article XI, which proposed amendment read as follows:

"Section 11-a. The limitations imposed upon the state by this section and by section 11 of this article shall apply both to general property taxes and taxes levied upon incomes, but not to other revenues. The state is hereby authorized to levy upon property in December, 1928, an amount of tax not exceeding three million five hundred thousand dollars ($3,500,000), plus 6 per centum thereof, less the estimated collections of income taxes to be made during the year 1929, and in any year thereafter the state may levy not to exceed said amount with any increase thereof within the limitations imposed by this section levied in any previous year, plus 6 per centum thereof, less the estimated collection of income taxes to be made during the ensuing year. The limitations herein imposed shall not apply to millage levies authorized by the people, nor to taxes levied for the payment of bonded indebtedness, or interest thereon."

This proposed constitutional amendment was submitted to the people at a special election on June 28, 1927, and was defeated by a vote of 84,697 to 19,393. The voters' pamphlet contained neither an affirmative nor a negative argument about it. At this same election an income tax measure, submitted by the legislature, was defeated by a vote of 67,039 to 48,745.

Plaintiffs, without mentioning the foregoing proposed amendment, call attention to house joint resolu-

tion No. 13, which was introduced at the regular session of the Forty-third (1945) Legislative Assembly, and proposed that article XI, § 11, be amended so as to restrict the application of the six per cent constitutional limitation to taxes on property. It also provided "that a majority of the legal voters of the state or of any county, municipality or district voting on the specific question shall have the power to include any such amount of increase in levy in the base for determining the amount of taxes which may be levied by it in any subsequent year." This resolution died in committee. We cannot concur in plaintiffs' contention that the introduction of this resolution amounted to a legislative interpretation that the revenue from income taxes was within the limitation of article XI, § 11. It merely contained certain suggested amendments which one of the members of the House desired. But the fact that the voters rejected the proposed constitutional amendment, known as § 11a, article XI—hereinbefore quoted—is of considerable importance for the reason that the people refused to vote in favor of amending the constitution to provide that "section 11 of this article [XI] shall apply both to general property taxes and taxes levied upon incomes, but not to other revenues."

Shortly after the adoption of article XI, § 11, of the constitution, and during its 1917 session, the legislature enacted chapter 203, General Laws of Oregon, 1917. Section 3-d of that chapter, codified with amendments as § 101-109, O. C. L. A., provided for a tax of two and one-half per cent on the gross amount of premiums received by every foreign or alien insurance company, which tax was in addition to the license fees required to be paid by these companies to the insurance commissioner. Subdivision 6 of that section provides that the taxes, fees and charges "as herein and else-

where provided for in the 'insurance law' shall be in lieu of all other taxes, licenses, fees and charges of every kind and character    *    *    *.'' These taxes have been reduced to two per cent (Or. Laws 1947, ch. 176). The revenue received from this tax was, in 1948, almost two million dollars. At no time has this revenue, the revenue from license fees paid by corporations under § 77-243, O. C. L. A., which amounted to more than $400,000 for the fiscal year 1948-1949, or the revenue from inheritance and gift taxes, which was more than one and one-half million dollars in 1949, been considered as within the six per cent limitation provided by article XI, § 11. We mention only a few of the taxes and license fees, the revenues from which are not considered as within the six per cent limitation.

We shall now briefly discuss the opinions of the attorney general, hereinafter referred to as ''A. G.'', which are cited by plaintiffs and defendants.

On October 8, 1923, A. G., 1922-1924, p. 417, the attorney general ruled, based upon *Northern Pac. Ry. Co. v. John Day Irr. Dist.*, 106 Or. 140, 211 P. 781, that the six per cent limitation had ''no relation to special assessments for benefits to property as made by an irrigation district under § 7328, Oregon Laws''; and, on December 6, 1923, A. G., 1922-1924, p. 498, based upon the same Oregon case, he held that the six per cent limitation did not apply to street and sewer assessments. In an opinion on February 23, 1929, A. G., 1928-1930, p. 130, the attorney general advised a member of the House that the revenue realized from an excise tax was not subject to the six per cent limitation but that a ''tax upon intangibles is a tax upon property'' and that the revenue from such tax was within the limitation fixed by § 11 of article XI. At the time

this opinion was given the legislature was considering both an intangible tax bill and an excise tax bill, which were passed during that session.

Again, the attorney general, on December 5, 1933, A. G., 1932-1934, p. 482, in an opinion to another state representative, advised him that the revenue from taxes imposed by two house bills then pending before the Second Special Session of the Thirty-seventh Legislative Assembly, 1933, would not be subject to the six per cent limitation. One of these bills imposed upon every individual a tax of two per cent upon his entire net income, to be used for certain designated purposes; the other bill imposed a tax on the transfer of estates of decedents. The following excerpt from the attorney general's opinion in reference to article XI, § 11, is very pertinent to our present discussion:

"* * * It is a matter within the knowledge of the public generally that the purpose of the amendment was *to limit the amount of property taxes that might be levied* without direct consent of the people affected thereby. * * *

"Examination of the records of the tax commission of the state of Oregon will reveal that the amount of public revenue derived from taxation of all kinds, including inheritance taxes, property taxes, income taxes, taxes upon intangibles, and excise taxes, as well as taxes upon the sale of motor vehicle fuels, has increased much more rapidly than section 11 of Article XI of the Constitution would permit if it applied to them.

* * * * *

"For a number of years past there has been a continued effort to provide public revenue from sources other than direct taxation of property, in order that the burden of property taxes might be relieved. If the constitutional limitation were to be construed to apply to such taxes as that pro-

posed to be imposed by house bill 56, the result would be that the constitutional limitation has been exceeded through the collection of taxes under such acts. *If, on the other hand, the limitation is construed to apply only to ad valorem taxes on property, the direct result sought by the people at the time the amendment was adopted will follow.*

"Ad valorem taxes are required to be levied in dollars and cents, and the amount thereof from year to year is a matter of record. The amount of taxes to be derived from taxing measures such as is proposed by house bill 56 is necessarily uncertain and indefinite. Whether or not the constitutional limitation has been exceeded could not be determined until after returns had been made by individual taxpayers. If upon the tabulating of such returns it appeared that the amount of revenue derived from all such taxing sources in any one year exceeded the amount derived from like sources for the next preceding year and six per cent thereof, hopeless confusion would result, and the fact that no method for the adjustment or refund of taxes thus erroneously collected has been provided for strongly indicates that the constitutional limitation was not intended to apply to any other than property taxes imposed on an ad valorem basis." (Emphasis supplied.)

In an opinion to the state treasurer under date of March 23, 1938, A. G., 1936-1938, p. 596, the attorney general observed: "It has been uniformly held that the 6 per cent limitation upon the power to levy taxes imposed by section 11 of article XI, of the constitution of Oregon, does not apply to miscellaneous revenue or to revenue derived from corporation excise, intangibles or personal income taxes."

The other cited opinions of the attorney general do not appear to have any bearing on the subject under discussion. One opinion, not cited, dated November 17,

1924, (A. G., 1924-1926, p. 42) holds that the six per cent limitation applies to income taxes. This court has not passed directly on the question whether or not article XI, § 11, is limited to property taxes.

Defendants assert that the ruling in *Sprague v. Fisher*, 184 Or. 1, 197 P. (2d) 662, 203 P. (2d) 274, "contains the plain implication that the limitation does not apply thereto [income tax]." We have found nothing in any of the several opinions in that case which seems to support defendants' statement. Plaintiffs contend that this court in *School District No. 24 v. Smith,* 97 Or. 1, 191 P. 506, "held a $10.00 *per capita* tax for the school fund to be within the 6 per cent limitation." They then say: "This was *not an ad valorem* or property tax, but a straight $10.00 *per capita* tax, ordered by the legislature. How, in the face of this case, can respondents say that the 6 per cent limitation has always been understood to be confined in its application to ad valorem or property taxes?" The statute providing for this tax is chapter 156, Laws of 1919, and is set forth in the opinion. The statute provides that the county courts of the several counties "are hereby required to levy at the same time other taxes are levied, a tax for school purposes upon all the taxable property of the county, which agregates an amount which shall produce at least $10 per capita for each and all the children within the county between the ages of four and twenty years * * *." The taxes which county courts are required to levy are against real and personal property, in other words, property taxes. We know of no other taxes which county courts could have levied in 1920, when the decision in that case was rendered.

It is provided in § 11, article XI, that "any part of any levy of taxes made by the state or any county,

\* \* \* which shall exceed the limitations fixed hereby shall be void." When we refer to levying a tax we generally have in mind a levy against real and personal property. The amount of revenue which would be raised in any one year is easily ascertainable when it is procured from an ad valorem property tax, and the danger of violating the provisions of § 11, article XI would be remote. But the amount of revenue which would be realized from an income tax, excise tax, license tax or privilege tax, for any one year, could not be ascertained until such taxes have been paid or reported, and, until then, there would be no way to determine whether the amount so raised was in violation of the six per cent limitation. The reasons suggested by the attorney general in his opinion of December 5, 1933, (A. G., 1932-1934, p. 482) previously quoted, in support of his ruling that § 11, article XI is limited to property taxes, are, in our opinion, sound. It demonstrates the utter futility of attempting to apply it to any other taxes.

■ In our opinion § 11, article XI of the constitution applies only to property taxes. It has no application to the revenue raised from taxes imposed by any of the twenty-two amendatory ordinances here involved. The conclusion here reached is inescapable when we consider the language of § 11; the argument accompanying its submission to the voters for their approval or rejection; the failure of the voters in 1927 to amend the constitution so that the limitation in § 11 would apply to both income and property taxes; the construction placed upon that section by the attorney general and the agency of the state which had charge of its administration; and other matters hereinbefore mentioned.

Plaintiffs' fourth and last assignment of error reads as follows:

"The court erred in failing to find that the tax levied and imposed by the 22 ordinances is not uniform but is discriminatory, in violation of Article I, Secs. 20 and 32, also Article IX, Sec. 1 of the State Constitution and Amendment XIV to the United States Constitution and therefore void."

Plaintiffs state that in the twenty-two ordinances 198 specifically enumerated businesses, professions, trades and callings are taxed, and that in addition thereto ordinance No. 89177, referred to as the omnibus ordinance, taxes "any business, profession, trade, or calling not specifically covered in said [License and Business] code".

The discussion of this assignment by plaintiffs is very general. They take a broadside shot at the entire twenty-two ordinances. Attention is directed to ordinance No. 89176 in which are listed 66 service businesses, all subject to a tax of $25, plus $3 for each employee. They then say: "What justification, what possible 'reasonable basis' can there be for taxing restaurants the same as mothproofers, fur blenders as ship joiners, title abstractors as carpet layers, just to name a few of the more ridiculous examples." They next call attention to ordinance No. 89190 which, in their language, has "the lawyers in with the astrologers, dentists with 'planning consultants,' whatever they are, the undertakers in with free lance writers."

After referring to the foregoing matters, plaintiffs argue that what the City Council did indicates that there was "no attempt at classification on a reasonable basis," or any attempt at anything "except to get everything and everybody that the classified section

of the telephone book, plus a good imagination, could suggest." They further argue "that these license ordinances were imposed in utter disregard and violation of the principles laid down for all licensing measures, namely, that 'the classification must be on some reasonable basis' ", and "that license classification must be in the 'exercise of a reasonable discretion' ". In support of their contention that there was "unlawful discrimination within classes", they say:

"Only cursory examination of the ordinances will demonstrate that many businesses just as much engaged in retail merchandising as the haberdashery or department store have been relieved from the $1.00 per $1,000.00 tax on gross sales. The auctioneer sells merchandise, either his own or others', certainly at a higher rate of profit or commission than his more orthodox competitor. True, he pays a stiff annual or per diem tax, but that is beside the point. Why should he be exempt from a tax on his gross sales? Those engaged in cabinet making, carpentry, millworking or woodworking, sell the products of their craft in competition with the furniture dealers, yet they pay only a flat $25.00 annually, plus $3.00 for each employee, nothing on their gross sales. By the same token, a clipping bureau sells its clippings, restaurants their food, tailors their clothes. All pay only a flat fee under No. 89175."

Plaintiffs continue along the same line of argument for about five more pages.

The contention made by plaintiffs that the tax imposed by these twenty-two ordinances is not uniform but is discriminatory, rendering the ordinances unconstitutional and void, is answered adversely to their contention in *Carmichael v. Southern Coal Co.*, 301 U. S. 495, 81 L. Ed. 1245, 57 S. Ct. 868, which is one

of the leading cases on the subject. The court there said:

> " * * * It is inherent in the exercise of the power to tax that a state be free to select the subjects of taxation and to grant exemptions. Neither due process nor equal protection imposes upon a state any rigid rule of equality of taxation. [Citing cases.] This Court has repeatedly held that inequalities which result from a singling out of one particular class for taxation or exemption, infringe no constitutional limitation. [Citing many cases.]

> "Like considerations govern exemptions from the operation of a tax imposed on the members of a class. A legislature is not bound to tax every member of a class or none. It may make distinctions of degree having a rational basis, and when subjected to judicial scrutiny they must be presumed to rest on that basis if there is any conceivable state of facts which would support it. [Citing cases.]

> "This restriction upon the judicial function, in passing on the constitutionality of statutes, is not artificial or irrational. A state legislature, in the enactment of laws, has the widest possible latitude within the limits of the Constitution. In the nature of the case it cannot record a complete catalogue of the considerations which move its members to enact laws. In the absence of such a record courts cannot assume that its action is capricious, or that, with its informed acquaintance with local conditions to which the legislation is to be applied, it was not aware of facts which afford reasonable basis for its action. Only by faithful adherence to this guiding principle of judicial review of legislation is it possible to preserve to the legislative branch its rightful independence and its ability to function."

See to the same effect: *Steward Machine Co. v. Davis,* 301 U. S. 548, 81 L. Ed. 1279, 57 S. Ct. 883; *State Board of Tax Commissioners v. Jackson,* 283 U. S. 527,

75 L. Ed. 1248, 51 S. Ct. 540, 73 A. L. R. 1464; *Safeway Stores v. Portland,* 149 Or. 581, 42 P. (2d) 162.

■ ■ The uniformity exacted in the imposition of an excise tax is geographical, not intrinsic. Under the equal protection clauses of the state and federal constitutions the state is not confined "to a formula of rigid uniformity in framing measures of taxation." It "may tax some kinds of property at one rate, and others at another, and exempt others altogether", and it "may lay an excise on the operations of a particular kind of business, and exempt some other kind of business closely akin thereto." *Steward Machine Co. v. Davis,* supra (301 U. S., at pp. 583, 584), and the cases therein cited. The above enunciated rules are applicable to municipalities.

■ ■ All presumptions and intendments are in favor of the constitutionality and validity of these ordinances. The City Council did not "record a complete catalogue of the considerations which" moved "its members to enact" these ordinances, and, as said in *Carmichael v. Southern Coal Co.,* supra: "In the absence of such a record courts cannot assume that its action is capricious, or that, with its informed acquaintance with local conditions to which the legislation is to be applied, it was not aware of facts which afford reasonable basis for its action."

■ There is nothing in the record before this court which would justify us in holding that the license tax imposed upon various classes of businesses, professions, trades, and callings is in violation of the equal protection, due process, or uniformity clauses of the state and federal constitutions.

The decree appealed from is affirmed. Costs will not be awarded to either party in this court.