Argued March 26, reversed with directions April 23, 1952

# EUGENE THEATRE COMPANY ET AL. *v.*
# CITY OF EUGENE ET AL.
### 243 P. 2d 1060

606

*George Black Jr.* argued the cause for appellants. On the brief were Black & Kendall, of Portland, and Bryson, Riddlesbarger & Bryson, of Eugene.

*John W. Pennington,* of Eugene, argued the cause and filed a brief for respondents.

Before HAY, Acting Chief Justice, and ROSSMAN, LUSK, LATOURETTE, WARNER and TOOZE, Justices.

TOOZE, J.

This is a suit brought under the uniform declaratory judgments act (§§ 6-601 to 6-616, incl., OCLA) by Eugene Theatre Company, a corporation, and Western Amusement Company, Inc., a corporation, as plaintiffs, against the city of Eugene, a municipal corporation, and the mayor, city recorder, city manager, city attorney, and chief of police of said city, as defendants, for the purpose of securing a judicial declaration that Ordinance No. 9117 of said city, which levies and imposes what purports to be a license tax upon theatrical and other exhibitions, shows, and public amusements, is unconstitutional and void.

The plaintiff Eugene Theatre Company is an Oregon corporation, and owns and operates two motion picture theaters in the city of Eugene, known respectively as the "McDonald Theatre" and the "Rex Theatre". Plaintiff Western Amusement Company, Inc., is a New Mexico corporation duly authorized to transact business in the state of Oregon, and owns and operates three motion picture theaters in said city of Eugene, known respectively as the "Mayflower Theatre", the "State Theatre", and the Heilig Theatre".

On March 8, 1948, the common council of the city of Eugene enacted, and on March 9, 1948, the mayor of said city approved, Ordinance No. 9117, which reads as follows:

## "ORDINANCE NO. 9117

"An Ordinance levying and imposing a license tax upon theatrical and other exhibitions, shows, and other public amusements, primarily for regulation, and also for revenue, fixing the amount, and providing for the collection thereof, to be in lieu of all other city licenses upon theatrical and other exhibitions, shows and other amusements, prescribing penalties, and repealing all ordinances and parts of ordinances in conflict herewith.

"THE CITY OF EUGENE DOES ORDAIN AS FOLLOWS:

"Section 1. It shall be unlawful for any person, firm, association or corporation, to operate within the City of Eugene, any theatrical or other exhibition, show or other public amusement without having first secured from the City Recorder of the City a license so to do.

"Section 2. The City Recorder shall prepare an application form to be subscribed by applicants, giving the applicant's name or names, residence address or addresses, place of business, the character of entertainment and the period of time which the entertainment will be shown and the admission charged.

"Section 3. If the Recorder shall find that the applicant has complied with all the other ordinances and regulations of the City, he shall thereupon, upon payment to him of $1.00, issue a license to the applicant and keep a suitable record of all of the information contained in the application. So long as the licensee shall comply with all the laws and regulations of the city and with the terms of

this ordinance, he shall be permitted to operate in the City of Eugene.

"Section 4. (a) There is hereby levied and imposed upon every theatrical, and other exhibitions, show, and other public amusement operating in the City of Eugene, a license tax for regulatory and revenue purposes.

"(b) Said license tax shall be measured and determined by computing three per cent (3%) upon the total of the admission charges, less all other taxes, collected by the licensee.

"(c) Licensees showing for periods of one day up to two weeks, shall make a daily statement on the following day to the City Recorder of the admission fees collected and accompany the same with a payment of the license tax.

"(d) Licensees operating permanently within the city shall file with the Recorder on or before the last day of each month a statement showing the admission fees collected during the immediately preceding calendar month, together with a computation of the tax under this ordinance and accompany the same with payment of the license tax.

"Section 5. The tax imposed by this ordinance shall be deemed to be held in trust by the licensee until the same shall have been paid to the City Recorder as hereinafter provided.

"Section 6. Any licensees failing to promptly account and remit to the City Recorder the license charge herein provided, shall be personally liable to the City for said funds, and in addition thereto shall be deemed guilty of a violation of this ordinance.

"Section 7. Nothing herein contained shall be deemed to impair or lessen the regulatory provisions of the various ordinances of the city with respect to the amusements herein licensed. Provided, however, that no other or further license charge shall be imposed upon any licensee hereunder.

"Section 8. That all ordinances and parts of ordinances in conflict herewith, and particularly Ordinance No. 8460 and Ordinance No. 8519 and Ordinance No. 9111, are hereby repealed.

"Section 9. Any person, firm, association or corporation violating any of the provisions of the Ordinance, either of wilful or intentional omission or wilful and intentional commission, shall upon conviction thereof before the Municipal Court, be subject to a fine of not to exceed $200.00, and upon default in payment thereof may be imprisoned in the City jail for one day for each $2.00 of fine unpaid, and such conviction shall automatically suspend the license of such person, firm, association or corporation until such fine shall have been paid or served in full, and all amounts due as taxes and licenses from such person, firm, association or corporation shall have been paid in full.

"Approved by the Mayor this 9th day of March, 1948.

"[Sgd.] Earl L. McNutt
Mayor

"Passed by the Common Council this 8th day of March, 1948.

"[Sgd.] Henry F. Beistel
City Recorder"

Pursuant to the provisions of the city charter of said city, this ordinance became effective thirty days following the date of its approval.

Plaintiffs procured licenses as required by the provisions of §§ 1, 2, and 3 of the ordinance. Some additional 58 licenses were issued to others under the ordinance.

Upon the hearing before the trial court, evidence was introduced, most of which was directed to the purposes of the ordinance. The trial court held the

ordinance to be constitutional and valid, and denied injunctive relief to plaintiffs. Plaintiffs appeal.

■■ The problem before this court for solution is the constitutionality of this ordinance, and it must be solved largely, if not entirely, by considering the provisions of the ordinance in the light of such powers as are vested in the city of Eugene by its charter. The testimony of witnesses as to the motives, intents, or purposes of the common council in the adoption of this legislation is wholly immaterial. The intent and purpose of the ordinance itself is material. However, we need not concern ourselves on this appeal with rules of statutory construction in an endeavor to ascertain the intent and purpose of this enactment, because it is agreed between the parties that the primary purpose thereof is to raise revenue. Even aside from this, the ordinance on its face clearly discloses its principal purpose. It is almost wholly, if not exclusively, a revenue-producing law.

Plaintiffs in their briefs indulged in considerable argument in their endeavor to show that this ordinance is in truth a revenue-producing measure, rather than a regulatory law, but all of such argument was unnecessary. The defendants have never contended that the enactment was other than what it purports to be; viz., a regulatory and revenue-producing ordinance. This is demonstrated by the following quoted from defendants' brief:

"It is apparent from a reading of Ordinance 9117 that it is the intention of the Common Council to require a license for the privilege of conducting theatrical and other exhibitions, shows and other public amusements as a regulatory matter, *and also to obtain revenue in the form of an occupation tax from persons, firms and corporations operating*

*said amusements within the City of Eugene.* It is submitted that it is obvious that this was the intention of the Common Council, as the ordinance expressly states that it is 'for regulation and also for revenue.' There has never been any contention by the Council or the defendants in this suit that the ordinance was enacted solely for the purpose of regulation. * * *

"It is elemental municipal law that the amount of a pure license fee for regulatory purposes only must bear some reasonable relationship to the cost of regulation. Defendants are cognizant of this general rule of law and agree with it.

"*The defendants do not contend that this ordinance is valid solely as a regulatory ordinance.* * * *" (Italics ours.)

3, 4. We agree with plaintiffs that, if this enactment were merely a regulatory ordinance, it would be unenforcable and void. The amount of money involved would render it so. Defendants do not contend otherwise. It is well established that a license imposed for regulatory purposes should not materially exceed the expense of issuing the license, and of necessary inspection and regulation of the business licensed. It is obvious that the fees imposed by the instant ordinance are far in excess of what might be deemed reasonably necessary for purposes of regulation. *Starker v. Scott et al.,* 183 Or 10, 21, 190 P2d 532; *In re Fine,* 124 Or 175, 177, 264 P 347; *Ellis v. Frazier,* 38 Or 462, 63 P 642; *In re Wan Yin,* 22 F 701, 703.

The real gist of the problem now before this court for solution is to be found in plaintiffs' second proposition, viz:

"As a tax for revenue for general city purposes, the 3 per cent tax exacted by this Ordinance 9117

is beyond the power of the City council of Eugene to levy or exact under the present charter of the City of Eugene.''

Counsel for the respective parties are in agreement that the answer we give to the question raised by the foregoing proposition will largely, if not wholly, determine the issues on this appeal. However, we note now that, if it should be decided that the power is vested in the city to adopt such revenue-producing measure, we will be called upon to answer one further objection urged by plaintiffs; viz., that the ordinance is void because it is allegedly discriminatory, arbitrary, and unreasonable, in violation of the provisions of art. 1, § 32, Oregon Const., and of the Fourteenth Amendment to the Constitution of the United States.

To determine the principal question confronting us, it is necessary that we consider the provisions of the charter of the city of Eugene. Prior to the adoption of art. XI, § 2, Oregon Const., municipal corporations were incorporated under charters granted by special acts of the legislative assembly. Article XI, § 2, Oregon Const., in part provides:

''Corporations may be formed under general laws, but shall not be created by the legislative assembly by special laws. The legislative assembly shall not enact, amend or repeal any charter or act of incorporation for any municipality, city or town.''

This provision was adopted under the exercise of the initiative powers on June 4, 1906. The charter of the city of Eugene, insofar as the questions involved here are concerned, is the legislative charter granted said city by the legislative assembly in 1905: ch. 252, Special Laws of Oregon, 1905.

So far as material to our discussion, that charter provides:

## "CHAPTER VII.

"* * * * *

"Section 48. The Common Council shall have power and authority within the limits of the City of Eugene—

"1. To levy, assess, and collect taxes, not to exceed one half of one per cent, except as otherwise provided in this act, upon all property, both real and personal, not exempt from taxation.

"* * * * *

"18. To license, tax, regulate, or prohibit barrooms, drinking shops, tippling houses, billiard rooms, dance houses, and all places where spirituous, malt, vinous, or intoxicating liquors are sold; billiard tables, bowling alleys, or other places of amusement are kept; *provided,* that no license for the sale of spiritous, malt, vinous, or intoxicating liquors shall be issued for any less amount than is or may be provided by the general laws of the State of Oregon in force at the time of the issuance thereof.

"* * * * *

"26. To license, tax, regulate, and restrain laundries, junk shops, dealers in junk, dealers in second-hand goods, brokers, pawnbrokers, money changers, drummers, commercial travelers, hotel runners, auctioneers, taverns, hawkers, peddlers, itinerant venders, transient dealers, and the selling of goods by samples, and to define what shall constitute the same.

"27. To license, tax, and regulate market houses and places.

"28. To regulate, license, tax, or prohibit the keeping of stallions and other animals kept for breeding purposes.

"* * * * *

"35. To license, tax, and regulate dogs and other domestic animals within the city, and to enforce the

collection of the same, and to kill or otherwise dispose of dogs and other domestic animals, when such license or tax is not paid; and to punish any person harboring or keeping any such animal upon which said license or tax is not paid.

"* * * * *. *

"47. *To license, tax, and regulate all such callings, trades, and employments as the public health or good may require to be licensed, taxed, or regulated,* and as not prohibited by the laws of the State of Oregon or of the United States. (Italics ours.)

"48. To license, tax, regulate, restrain, prohibit, or suppress all offensive trades and occupations.

"49. *To license, tax, and regulate or restrain theatrical and other exhibitions, shows, and other public amusements.* (Italics ours.)

"* * * * * *

"67. To enact any and all ordinances, by-laws, and regulations not inconsistent with the constitution or laws of this State or of the United States as shall be needful to the peace, good order, health, cleanliness, ornament, prosperity, and general welfare of the city, and secure the protection of persons and property therein.

## "CHAPTER VIII.
### of taxation.

"Section 49. On or before the last day of December in each year the Council shall make an estimate of the amount of funds necessary to be raised by taxation for the purpose of paying all authorized demands upon the treasury of the city, and shall levy a tax therefor, which shall be certified by the Recorder to the County Clerk of Lane County, who shall extend the said tax in an appropriate column upon the county tax roll. The said tax shall be collected by the officer collecting the county tax, and shall be turned over by him to the County Treasurer, who shall issue triplicate receipts therefor to the county tax collector. The county tax collector shall retain one of said receipts

and file one with the County Clerk of Lane County, and transmit the third one to the Recorder of the city. The Recorder shall turn the said receipt over to the City Treasurer, and charge him with the amount thereof. The County Treasurer shall pay over to the City Treasurer the city tax so paid to him on demand, and the City Treasurer shall at the same time file with the County Treasurer said triplicate receipt. The tax levy as certified to the County Clerk shall be in one sum, and shall be entered in a column headed 'City of Eugene Tax.' Neither the Sheriff, tax collector, County Treasurer, or Lane County shall receive any fees or compensation for collecting such taxes."

The several numbered subdivisions of § 48 which we have omitted to quote enumerate the usual police powers vested in a city, such as prohibiting animals running at large, to define and prohibit unlawful gaming, to define and punish vagrancy, etc.

▆▆▆ It is an established rule of law that the power to tax is not inherent in a municipal corporation. The authority to tax is not only a delegated authority conferred by the state, but it is assumed that the state has given all it intended should be exercised, and the grant, like that of all special and limited grants, is to be strictly construed. Where municipal authority to tax is doubtful, the doubt is to be resolved against the tax and in favor of the taxpayer. But this rule of strict construction goes only to the power to tax. Once the power is established, then a more liberal rule applies as to its exercise. As was said by the late Mr. Justice ROBERT S. BEAN in *Corbett v. City of Portland,* 31 Or 407, 414, 48 P 428:

"The principle is universal that whenever a municipality or other governmental agency of a state seeks to impose the burden of taxation upon

a citizen or upon his property it must be able to show the grant of such power by express words or necessary implication. No doubtful inference from other powers granted or from obscure provisions of the law, nor mere matters of convenience, or even necessity, will answer the purpose. The grant relied upon must be evident and unmistakable, and all doubts will be resolved against its exercise, and in favor of the taxpayer.''

Also see *Fullerton v. Central Lincoln Utility Dist.*, 185 Or 28, 38, 201 P2d 524; 1 Cooley, Taxation 4th ed, 276, § 122; 283, § 125; 3 McQuillin, Municipal Corporations 2d rev. ed, 636, § 1087.

■ As before observed, a different rule applies in testing the exercise of a power to tax, from that which applies in determining the existence of such power. If the power exists, then the legislative body has the right to finally determine the amount or rate of a tax, in the absence of constitutional prohibitions. It may levy a tax of any amount it sees fit. The power is unlimited in its reach as to subjects to be taxed, and also in its very nature acknowledges no limits, and may be carried to the extent of exhaustion and destruction, thus in its exercise becoming a power to destroy. *McCulloch v. Maryland,* 4 Wheat (US) 316, 4 L ed 579.

■■ As stated in 1 Cooley, Taxation 4th ed, 181, § 72:

"If the taxes are oppressive or unjust, the only remedy is the ballot box and the election of new representatives. * * * The judiciary can afford no redress against oppressive taxation, so long as the legislature, in imposing it, shall keep within the limits of legislative authority, and violate no express provision of the constitution. * * *

"*The amount of a license or occupation tax,*

*where it is a tax as distinguished from a fee imposed in the exercise of the police power, is within the discretion of the legislature and cannot be reviewed by the courts.* It is 'only when the license fee is exacted solely as a police regulation that the court can consider whether it is so unreasonable as to amount to a prohibition.' \* \* \*'' (Italics ours.)

The statement by Cooley, which we have emphasized, is subject to some qualifications. If an occupation tax is palpably arbitrary, capricious, and unreasonable, it is manifest that the courts should afford relief therefrom. Some courts have done so. *Morton v. City of Macon,* 111 Ga 162, 36 SE 627, 50 LRA 485; *City of Louisville v. Pooley,* 136 Ky 286, 124 SW 315, 25 LRA NS 582, and note.

■ Plaintiffs argued that, under the express provisions of the Eugene charter to which we have heretofore directed attention, the city is wholly without power to levy or impose occupation taxes for revenue purposes. They contend that, under the authority given the city "to license, tax, and regulate or restrain" theatrical and other exhibitions, shows, and other public amusements, the city is confined to licensing for regulation only. In this connection plaintiffs maintain that the doctrine of noscitur a sociis applies. The rule is stated in 50 Am Jur, Statutes, 241, § 247, as follows:

"The meaning of statutory terms depends upon the connection in which they are used, and in the interpretation thereof, the doctrine of construction, noscitur a sociis, prevails. Hence, the meaning of particular terms in a statute may be ascertained by reference to words associated with them in the statute. Where two or more words of analogous meaning are employed together in a statute, they

are understood to be used in their cognate sense, to express the same relations and give color and expression to each other. * * *''

■ Emphasis is then placed by plaintiffs upon the word ''regulate'' as used in connection with the words ''license'' and ''tax'', and it is insisted that these latter words must be deemed colored and limited thereby. However, the rule in question is one of statutory construction only, and it stands upon the same footing as other rules of interpretation. It is well established that words of the character used do not always have exactly the same meaning, and, in the final analysis, the meaning in which they were intended to be used must be determined from an examination of the whole charter.

However, plaintiffs assert that, considering the charter as a whole, it is manifest that the legislature did not intend that the city should have the power to raise revenue other than as provided in subd. 1 of § 48 and in § 49, above quoted. They emphasize the following portion of § 49: ''the Council shall make an estimate of the amount of funds necessary to be raised by taxation for the purpose of paying *all authorized demands* upon the treasury of the city, and shall levy a tax therefor * * *.'' (Italics ours.)

It is claimed that this requirement of the charter limits the power of the city to raise revenue in any manner other than by the levy, assessment, and collection of taxes. These provisions of the charter refer to taxation in the true sense of the term. Based upon this premise, plaintiffs then declare that it is clear the legislature intended the words ''license, tax, and regulate'' to refer to regulation only in an exercise of the police power.

No weight can be given this argument, because we are bound in this litigation by the rule of stare decisis.

In 1903 a case came before this court, involving the charter of the city of Portland. There, the city had enacted an ordinance imposing a license tax upon plaintiff as an attorney at law. *Lent v. Portland,* 42 Or 488, 71 P 645. The ordinance provided, among other things, that all persons practicing the profession of law in the city should pay a quarterly license fee from $1 to $15, depending upon their respective incomes for the preceding 12 months.

Subdivision 1 of § 32 of the Portland charter was then in substance the same as subd. 1 of § 48 of the Eugene charter, supra. Subdivision 2 of § 32 gave the common council the power and authority *"to license, tax, and regulate* brokers, * * * places of amusement or entertainment, including theaters, operas, exhibitions, shows, and the like; hotel, tavern, and boardinghouse keepers and runners * * * and for the purpose of this act, to define and declare what constitutes any of such professions, callings, employments, or places of amusement or entertainment." Subdivision 3 of § 32 gave the city power *"to license, tax, and regulate* livery or boarding stables, hacks, * * *"; subd. 4 empowered the city *"to license, tax, regulate,* and restrain bartenders, saloon keepers, * * *"; subd. 21 provided the city might "license, tax, control, and regulate washhouses and laundries, and to provide for the exclusion from the city limits, or any part thereof, of washhouses, laundries, and slaughterhouses"; and by subd. 33, gave additional power *"to license, tax, and regulate for the purpose of city revenue* all such business, callings, trades, and employment as the common council may require to be licensed and as are not prohibited by the laws of the state." (Italics ours.)

Subdivision 33 of § 32 of the Portland charter is the equivalent of subd. 47 of § 48 of the Eugene charter, except that in the Portland charter provision are contained the words "for the purpose of city revenue", while those words are omitted from the Eugene charter provision.

If it were not for what is said by the court in the Lent case, we might attribute some importance to this difference between the provisions of the two charters. However, this court, speaking through the late Justice WOLVERTON, after inviting attention to the specific provisions of the charter hereinabove referred to, had the following to say:

> "All these subdivisions contain specific grants of power; that under the first being limited to a levy of eight mills on the dollar upon all property, both real and personal, taxable by law within the city, and that under the last named being restricted for the purpose of city revenue. *The other four contain the usual authorization to license, tax, and regulate the business, callings, trades, and occupations therein enumerated, and such like, without especial restriction. It was not intended that all the city revenues should be derived from the eight-mill tax upon real and personal property.* This is apparent from the authorization accorded the city council to devote the entire fund to be derived therefrom to specific purposes, which do not comprehend all the needs of the city. *But it was designed that the city should derive its revenues from specific as well as from general taxes, and to augment them was manifestly one of the purposes of the adoption of subdivisions 2, 3, 4, 21, and 33.* The first four of these subdivisions authorize as well an exercise of the police power. Not so with the last named. The power is there restricted to the one purpose, as we have previously indicated. *All these subdi-*

*visions should be construed in pari materia, being component parts of the same act, and effect given to each, unless there is found to be a positive repugnancy to the general intent.* It is stoutly insisted that, by the use of the words 'all such,' preceding 'business, callings, trades, and employment,' etc., the application of the provision is restricted to such business, callings, trades, and occupations as are mentioned in subdivisions 2, 3, 4 and 21, and the like, and that, under the rule *ejusdem generis,* it could not by any reasonable interpretation be held to include the legal profession. We are of the opinion, however, that it was not intended that these words should have any such signification. They were employed as indicative of qualification with reference to that subdivision only, and their scope cannot be otherwise extended. The reading is plain and the meaning manifest. 'All such business, callings, trades, and employment as the common council may require to be licensed and as are not prohibited by the laws of the state,' the two latter clauses alone setting the limit of the delegated power. The scope of the subdivision is broad enough to include not only all such callings, trades, occupations, and employment as are mentioned in subdivisions 2, 3, 4, and 21, and the like, but all that the common council may require to be licensed under the restriction of the succeeding clause. *This subdivision was designed solely for raising revenue, while the others were intended as police regulations as well.* Such is the feature distinguishing this from these other subdivisions, and it makes the charter regulations perfectly consistent, when construed as a whole. * * *'' (Italics ours.)

From the foregoing, it is manifest that the words ''for the purpose of city revenue'', contained in subd. 33 of § 32 of the Portland charter, were in no way important to the interpretation placed upon the words ''license, tax, and regulate'' as used in the other sub-

divisions of § 32, and also as used in the Eugene charter.

■ This case was decided prior to the adoption of the legislative act of 1905, which provided a charter for the city of Eugene, and it is to be presumed that in enacting that law the legislature had in mind the interpretation placed upon the words "license, tax, and regulate" as used in city charters, and adopted the act in the light thereof.

■ We are of the opinion that the decision of this court in the Lent case conclusively establishes the power of the city of Eugene, under those subdivisions of § 48 of its charter respecting the right to "license, tax, and regulate", to which attention has been called, to levy and impose occupation taxes for the purpose of raising revenue.

This conclusion is strengthened by the decision of this court in *Abraham v. City of Roseburg,* 55 Or 359, 105 P 401. In that case there was involved an ordinance of the city of Roseburg which imposed a license fee of $10 upon each person pursuing the occupation of attorney at law. The fee imposed was an occupation tax levied for the purpose of raising revenue.

The Roseburg charter was also a legislative charter granted by the legislative assembly in 1905: ch. 236, Special Laws of Oregon, 1905. Subdivision 1 of § 33 of the Roseburg charter respecting the powers of the common council is in substance the same as subd. 1 of § 48 of the Eugene charter. In addition to the usual police powers enumerated in city charters, the Roseburg charter vested the council with power to *license, tax, and regulate* hawkers, peddlers, pawnbrokers, shows, public amusements, and various employments and occupations therein expressly named. Besides this

grant of power, subd. 34 of § 33 of the charter reads as follows:

"34. To license and regulate all such callings, trades, and employments as the public good may require to be licensed and regulated, and as are not prohibited by law."

It was pursuant to the power vested in the city by this provision of the charter that the ordinance in question was adopted. Plaintiff Abraham contended that the ordinance was void, because, as he maintained, under that provision the city had no power to enact a measure for revenue purposes, but, on the contrary, was confined to the enactment of measures for regulation only.

At page 361 of 55 Or, the late Mr. Justice McBride said:

"The power of the legislature to grant to municipalities authority to impose a tax upon occupations and employments is not disputed, and has been upheld by this court. *Lent v. City of Portland,* 42 Or. 488 (71 Pac. 645)."

After inviting attention to some well-established rules of construction regarding charter powers, the court, at page 362, then stated:

"There are many conflicting decisions on this subject, several courts holding that under charter provision, such as the one above quoted, no fee could be charged beyond the reasonable cost of issuing the license and regulating the occupation to be carried on. * * * Other courts, and perhaps the most recent decisions, hold that under a power to 'license and regulate' employments the license may be used as a means of raising revenue. * * * *It is not disputed that if the words, 'for the purpose of raising revenue,' had been added to the section of the charter above quoted, the authority to collect*

*the sum imposed upon attorneys for a license would have been unquestionable, but we think the language used is quite as comprehensive.* It authorizes the imposition of a license upon all such employments as 'the public good may require to be licensed.' Now, the term 'public good' is exceedingly broad. Enough so to include the raising of revenue if, in the judgment of the council, revenue is needed.''

We have examined the briefs filed in this court in the Abraham case and note therefrom that the city argued that the words "license and regulate", as used, authorized the imposition of an occupation tax for revenue purposes, and cited authorities in support of its position.

Plaintiffs contend that the decision in the Abraham case was based upon another ground. It is true that the court did call attention to *another consideration* which it stated should have great weight in the decision of the matter then before us. It appeared that the provision appearing in the Roseburg charter had been copied word for word from the charter of San Francisco, passed in 1872. The California court had construed that provision of the San Francisco charter as authorizing the imposition of a license tax for the purpose of raising revenue. Ex Parte Frank, 52 Cal 606, 28 Am Rep 642. As to this, we said:

''* * * It is a familiar rule of statutory construction that, where a statute of one State is adopted or copied into the statutes of another State, it is presumed to have been adopted with the construction placed upon it by the courts of the State where it originated. * * *''

However, it was unnecessary to resort to this rule of statutory construction in order to uphold the validity of the ordinance in question. The question had already

been decided in what had been said prior to the latter discussion. The rule of construction was referred to only as an *additional* reason for holding the law valid; not the sole, nor most important, reason.

For us in the instant litigation to uphold the contention of plaintiffs that the city of Eugene lacks the power to levy and impose occupation taxes for revenue purposes under the provisions of its charter would necessitate an express overruling of our prior decisions in the Lent and Abraham cases. To do this at this late date might well produce financial chaos so far as the cities and towns of this state are concerned. Unquestionably, many cities and towns have enacted and amended charters and adopted ordinances in reliance upon what this court said in the two cases mentioned. For that reason, if for no other, this court would be extremely hesitant in disturbing the status quo. But aside from all that, we are of the opinion that those decisions were based upon sound reasoning and correctly stated the law.

As their third proposition, plaintiffs allege:

"This Ordinance 9117 is void for the additional and separate reason that the tax imposed by said ordinance is in reality an excise tax on admissions and under no possible theory or construction is such a tax authorized by the Eugene charter."

With respect to this contention, plaintiffs maintain that the tax imposed by the ordinance is not, in truth, an occupation tax, but, on the contrary, is an excise tax on the sale of tickets of admission; that it is, in effect, an admissions tax such as is imposed by the federal government: title 26, Int Rev Code, § 1700 (e), USCA.

An occupation tax is a form of excise tax.

*Viquesney v. Kansas City,* 305 Mo 488, 266 SW 700. It is a tax imposed upon a person for the privilege of carrying on a business, trade, or occupation. We have held that, under its charter, the city of Eugene has the power to impose license taxes for revenue purposes. But the question is now posed whether the tax levied by Ordinance 9117 is an occupation tax in the true sense of that term. Or is it a form of excise tax that is beyond the power of the city to levy?

In 1 Cooley, Taxation 4th ed, 283, § 125, the following rules are stated:

"The scope of the delegated power to tax depends upon the wording of the governing statute or charter. The municipal corporations of a state having no inherent power to tax must take such power as is conferred under the conditions and limitations that may be prescribed, and only for such purposes as may be expressed. This is fundamental. * * *

"The authority to tax is not only a delegated authority conferred by the state, but it is assumed that the state has given all it intended should be exercised, *and the grant,* like that of all special and limited grants, *is to be strictly construed.* Where municipal authority to tax is doubtful, the doubt is to be resolved against the tax. * * * Municipal authorities, therefore, when they assume to tax, must be able to show warrant therefor in the words of the grant, which alone can justify their action. * * *

"* * * * * *

"*If power is expressly granted to levy particular taxes, it excludes by implication power to levy other taxes.* Express power to levy particular taxes is a negation of the power to lay others * * *.

"* * * * * *

"*The general rule that the powers of a municipal corporation are to be construed with strictness is*

*peculiarly applicable to the case of taxes on occupations * * *.  * * *''* (Italics ours.)

In the *City of Coos Bay v. Eagles Lodge,* 179 Or 83, 106, 170 P2d 389, this court said:

"Statutes granting authority to municipalities to impose an occupation or privilege tax must be strictly construed. * * *"

■ In construing Ordinance 9117, we are confronted with the well-established rule that there must be certainty as to the meaning and scope of language imposing any tax, and doubt in respect to its meaning is to be resolved in favor of the taxpayer. *Treat v. White,* 181 US 264, 21 S Ct 611, 45 L ed 853.

■■ There is a clear distinction to be drawn between an admissions tax, a sales tax, and other such special forms of taxation, on the one hand, and a license tax imposed upon a person for the privilege of engaging in some business or calling, on the other. In a general sense, all are excise taxes. But in its proper sense, an excise is "something cut off from the price paid on the sale of goods as a contribution to the support of government". *Buckstaff Bath House Co. v. McKinley,* 198 Ark 91, 127 SW2d 802, 806; *Shanks v. Kentucky Independent Oil Co.,* 225 Ky 303, 8 SW2d 383; 26 RCL, Taxation, 34, § 18. An admissions or sales tax is not paid by the person who operates the business. He simply collects it from his patron or customer and later delivers it to the taxing agency. Thus it is the patron or customer who actually pays taxes of that type. The "take home" money of the operator of the business is not thereby reduced. On the other hand, an occupation tax is paid by the person engaged in the taxed business, and, to the extent of the levied tax, it reduces the amount of his earnings.

■ However, a true occupation tax is no less an occupation tax because the amount thereof is measured by the gross receipts from sales or services. We recognized that in *Lent v. City of Portland,* supra, and also in *Garbade and Boynton v. City of Portland,* 188 Or 158, 214 P2d 1000, and in *Barnard Motors v. City of Portland* 188 Or 340, 215 P2d 667. But as we shall later point out, the precise point now under consideration was not directly decided in either of those cases. Also see *Revzan v. Nudelman,* 370 Ill 180, 18 NE2d 219; *Golden Age Breweries v. Henneford,* 193 Wash 536, 76 P2d 598.

■ The question before us is not whether the city of Eugene has the power to measure the amount to be paid as a license or occupation tax by the gross receipts of the business, but rather it is whether it has done so under the provisions of this ordinance. We are here concerned with this particular ordinance and with the particular tax therein imposed. It is immaterial that the city might accomplish the same end by a different method or a different tax. *McLeod v. Dilworth Co.,* 205 Ark 780, 171 SW2d 62, 322 US 327, 88 L ed 1304, 1306, 64 S Ct. 1023.

We will now direct our attention to the specific provisions of the Eugene ordinance. The significant portion of the title to the ordinance is the following:

"An Ordinance *levying* and imposing *a license tax upon theatrical and other exhibitions, shows, and other public amusements,* primarily for regulation, and also for revenue, fixing the amount, and providing for the collection thereof * * *." (Italics ours.)

It will be observed that the title speaks of the imposition of a *license tax upon the amusements,* not upon

the operator of such. The importance of this observation will become apparent as we discuss the provisions of the ordinance.

Section 1 refers exclusively to the operator of the amusement and makes it unlawful for him to engage in business without having first procured a license so to do. Section 2 deals solely with the form of application for a license. Section 3 provides a *license fee* of $1 to be paid by the applicant for a license. The payment of this license fee and the issuance of the license entitle the licensee to conduct his amusement business "so long as the licensee shall comply with all the laws and regulations of the city and with the terms of this ordinance." This license fee imposed directly upon the operator is manifestly a regulatory fee and is in no sense a license tax for revenue.

We now come to § 4 of the ordinance, which provides for an excise tax for revenue purposes. Subdivision (a) of § 4 provides:

"*There is* hereby *levied* and imposed *upon every theatrical, and other exhibitions, show, and other public amusement* operating in the City of Eugene, *a license tax* for regulatory and revenue purposes." (Italics ours.)

The most significant thing about this provision is that the so-called "license tax" is not levied or imposed directly upon the person operating the business as a tax upon his right to carry on his pursuit; to the contrary, it is a tax levied and imposed upon the business itself. This must be kept in mind as we examine remaining provisions of the ordinance.

Subdivision (b) of § 4 then provides:

"Said license tax shall be measured and determined by computing three per cent (3%) upon

the total of the admission charges, less all other taxes, collected by the licensee.''

Section 5 then provides:

"*The tax imposed by this ordinance shall be deemed to be held in trust by the licensee* until the same shall have been paid to the City Recorder as hereinafter provided.'' (Italics ours.)

In construing this ordinance, effect must be given to all its terms, if possible. In the construction of a statute, the office of the judge is simply to ascertain and declare what is, in terms or in substance, contained therein, not to insert what has been omitted, *or to omit what has been inserted.* § 2-216, OCLA. For that reason, we are not permitted to ignore the plain wording of § 5.

Under this section the licensee is designated a trustee for the city. A trustee of what? The ordinance speaks for itself. He is a trustee of the taxes collected by virtue of the provisions of § 4 (a). One cannot be a trustee of his own funds. The licensee, therefore, is made a trustee of funds belonging exclusively to the city. He becomes a trustee for the city of 3% of each admission charge collected, excluding the federal admissions tax on admissions. The right and ownership of the city attaches immediately as each admission is paid. Three per cent thereof never becomes the property of the licensee. We cannot give effect to the provisions of § 5 unless this is true, and we have no right to eliminate that section from the ordinance. It is wholly immaterial whether the licensee adds this tax to the established admission price or absorbs the tax himself, either of which course he may pursue. It is a tax on admissions in either case, and he is simply the collector, custodian, and trustee of the tax so col-

lected until he accounts to the city therefor and pays the same over. No personal liability attaches to him for the amount of tax collected unless and until he fails "to promptly account and remit to the City Recorder the license charge herein provided", as set forth in § 6 of the ordinance. Personal liability, loss of license, and punishment by fine are but the penalties provided for a betrayal by the licensee of the terms of his trust.

■ The provisions of § 5 simply carry out the intent and purpose of § 4 (a). As we before observed, the levy under § 4 (a) is directly against the business itself, and is not a tax imposed upon the person conducting the business, as a condition of his right to carry on his operations. This tax does not possess any of the earmarks of a license or occupation tax. On the other hand, the ordinance clearly discloses that the tax imposed is a pure excise in the nature of an admissions tax. It is a type of sales tax. In effect, it is precisely the same as the federal admissions tax.

■ Does the charter of the city of Eugene vest it with power to levy that sort of a tax? We find nothing in the charter that expressly confers that power, nor do we think it can be implied from the power to impose and collect license taxes. As Mr. Cooley said, supra: "If power is expressly granted to levy particular taxes, it excludes by implication power to levy other taxes. Express power to levy particular taxes is a negation of the power to lay others." As we have before observed, in determining the question of power residing in the city of Eugene, the charter is to be strictly construed.

Defendants' counsel in his brief does not seriously contend that the city has the power to levy an admissions tax. He defends the ordinance solely upon the

ground that the tax imposed is a pure license tax, and is in no sense an admissions tax. As the basis of his contention, he seeks to draw a distinction between the requirements of this ordinance and enactments which specifically provide that the tax imposed be collected from the purchaser. However, under the provisions of this ordinance, considered as a whole, there is no distinction to be drawn between the two situations. The three per cent tax fastens upon each admission as it is paid by the patron, and it immediately becomes the property of the city. A specific requirement that the customer pay the tax in addition to the established admission price would in no way alter the situation. Defendants' counsel argues:

"There is nothing in the ordinance that says that the tax shall be added to the price of admission or be collected from the patrons. It is a transaction solely between the operator and the city. He is charged a license tax for regulation and revenue purposes, measured at the rate of three per cent of the admission charged. It is submitted that this is a common form of occupation tax."

The ordinance on its face fails to bear out this contention. This will be made more apparent as we discuss some additional authorities.

In *City of St. Petersburg v. Florida Coastal Theatres,* 43 So2d 525, 527, there was involved an ordinance imposing a tax of ten per cent on gross admission to appellees' theaters, which was exclusive of the 20 per cent federal admission tax. In substance, the tax was similar to that imposed by the Eugene ordinance. The charter of the city of St. Petersburg authorized it "to impose license taxes upon privileges, businesses, occupations, and professions carried on and engaged in within the City; and the amount of such

taxes shall not be dependent upon the general State revenue law." It is manifest that the power vested in the city of St. Petersburg is even greater than that vested in the city of Eugene; at least, it is more definite and specific. The court said at page 527:

"The term 'License taxes' has a well-settled connotation in legal terminology and has reference to a charge imposed for the privilege of engaging in a business or profession. Section 3(c), Chapter 15505, Acts of 1931, authorizing the City to impose a license tax, *is the customary power granted to municipalities and has no provision extending that power to impose other taxes on similar subjects* when deemed advisable by the City.

"The act on which the ordinance in question is predicated *clothes the city with nothing more than a general grant of power and under the cases last cited could not possibly be extended to a specific grant to impose an excise tax of the character described in the ordinance.* The attributes of an excise tax of the kind complained of are materially different from the license tax named in the authorizing statute, and since the latter contains no words of general import extending the authority, we think the City was without power to impose the tax complained of.

"*The tax proposed by Ordinance 1104-B is a tax over and above the license tax authorized by the provisions of the City Charter and the Statutes heretofore quoted.* It is out of the usual range of power conferred on the City and requires special legislative authorization. In other words, a specific grant of power to impose it. It certainly could not be comprehended in the authorization for a license tax. At the recent session of the legislature the City of St. Petersburg, as did many other cities, secured the passage of acts authorizing them to impose such a tax, but they were all vetoed by the Governor. It is pertinent to point out that the legislature of 1949, Chapter 26319, imposed a limited

sales tax. It applies to theatre admissions of over 40 cents and was limited to three per cent. Any such power was denied to municipalities.'' (Italics ours.)

■ We note that in the instant case plaintiffs make a point of the fact that an attempt was made by the city of Eugene to secure legislative action at the 1947 legislative session, authorizing the type of tax imposed by Ordinance 9117. No such legislation was adopted by the legislature. As to the contention of plaintiffs based upon this, we invite attention to *Safeway Stores v. Portland,* 149 Or 581, 604, 42 P2d 162, where it is said:

"It is argued that the ordinance violates the established public policy of the state of Oregon, as bills containing a similar provision to those of the ordinance have been introduced in the legislature, and have failed to pass. The policy of the state is shown by its constitution and enacted laws. The public policy of the state of Oregon is not indicated by measures which have been introduced in the legislature but have not been enacted into laws.''

In *City of Louisville v. Churchill Downs,* 267 Ky 339, 102 SW2d 10, 13, two taxing statutes of the state of Kentucky were before the court for consideration. The first act adopted in 1932 provided that a person, firm, association, or corporation engaged in the business of conducting a race track shall pay a stipulated sum each day upon which races are run, as a license tax. The second act, adopted in 1934 and known as the Gross Receipts Tax Law, provided:

"An excise tax is hereby imposed on every person operating a place of amusement and/or entertainment equal to three per centum (3%) of the gross receipts derived from the operation of said place or places of amusement and/or entertainment,

*and every person* operating a place of amusement and/or entertainment *is required to collect a tax from the purchaser of the tickets of admission and/or account to the State of Kentucky for such tax,* in the manner provided in this act.'' (Italics ours.)

The plaintiff Churchill Downs, under the 1932 act, paid $2,500 per day license tax. It contended that the tax imposed by the 1934 act was also a license tax upon its right to do business, a duplication of the tax fixed by the 1932 law, and that, therefore, the 1932 act was repealed by the later enactment. The court answered that contention as follows:

"There is no duplication. It is an additional tax. *The first is a license to do business. The second is purely an excise.* While the distinction sometimes is not recognized and inexact expressions regard the two as synonymous, an excise tax is in its proper sense 'something cut off from the price paid on a sale of goods as a contribution to the support of the government.' State Tax Commission v. Hughes Drug Co., 219 Ky. 432, 293 S.W. 944, 945, quoting 26 R.C.L. 34. The difference was recognized and the right to impose both taxes was upheld in Shanks v. Kentucky Independent Oil Co., 225 Ky. 303, 8 S.W. (2d) 383, where the company contended that it was not liable to pay a tax on its gasoline sales under the gasoline tax act of 1924 (chapter 120, Acts 1924), since it had already paid a license for the privilege of doing business in Kentucky. It was held that the fact that the seller was required to collect from the user did not alter the essential character of the tax from an excise on the thing itself. Of closer application is Pullman Co. v. Knott, State Comptroller, 70 Fla. 9, 69 So. 703. It was there held to be within the legislative discretion to impose a tax on gross receipts from intrastate business, in addition to a license tax as a condition precedent to a right to do such business.

The act was held not to violate any provision of the Federal Constitution in *Pullman Co. v. Knott,*

*Comptroller,* 235 U.S. 23, 35 S.Ct. 2, 59 L.Ed. 105.''
See also *Shannon v. Streckfus Steamers,* 279 Ky 649, 131 SW2d 833, 838.

In these cases a clear distinction is made between a license or occupation tax imposed on the privilege to conduct a business and a pure excise tax. We note that the law involved in the Churchill Downs case required the plaintiff to collect the tax imposed from the patron. But, as above stated, the failure of the Eugene ordinance to make that specific requirement is immaterial.

In *O'Neil v. United Producers & Consumers Co-op.,* 57 Ariz 295, 113 P2d 645, 647, the question for decision was whether a sales tax came within the meaning of the term ''license tax''. The Arizona act imposed a sales tax of two per cent on all sales of merchandise. The Co-op paid an annual license fee, but under the law it was ''exempt from all franchise or license taxes.'' The court said:

> ''* * *. * * * as we view it, the sales tax is not a license tax within the meaning of this term, as used in the expression 'exempt from all franchise or license taxes.' It is an excise tax imposed by the legislature in the exercise of its taxing power for the purpose of raising revenue and in no sense of the term for regulation. The power to provide for such a tax does not rest or originate in the police power of the state which enables it to regulate business in the interest of public peace, health and safety. That the sales tax is not a license tax is pointed out in Shanks v. Kentucky Independent Oil Co., 225 Ky. 303, 8 S.W.2d 383, 385, where the court, in distinguishing between an excise tax in its original limited sense and a license tax, said that

'the tax levied by this act is an excise' and approved the statement in 26 R.C.L. 34 that 'excises, in their original sense, were something cut off from the price paid on a sale of goods, as a contribution to the support of the government.' It then followed with this language:

'A license tax or tax for the privilege of doing business is sometimes referred to as an excise, as are all forms of taxation which are not burdens laid directly upon persons or property. The three-cent tax on gasoline imposed by the 1924 act, however, is an excise in the original and limited sense, being "something cut off from the price paid on a sale of goods, as a contribution to the support of the government." A careful reading of the act convinces us that *the tax imposed was not intended as a license tax or a tax for the privilege of engaging in the business of selling gasoline in this state.* * * *' " (Italics ours.)

In April, 1949, the city of Portland adopted a series of ordinances which imposed certain license taxes for the purpose of raising revenue. Those ordinances and questions relating to their adoption came before this court for consideration in 1950. *Garbade and Boynton v. City of Portland,* supra; *Barnard Motors v. City of Portland,* supra. In substance and purpose the several ordinances were to all intents and purposes the same. Each ordinance dealt with a particular business, trade, or occupation. They all constituted an integrated revenue-raising or taxing program by the city. Mr. Justice BAILEY, now retired, but long recognized as an authority upon questions of taxation, wrote the opinion of the court in each case.

In the Barnard Motors case two of the ordinances were involved; viz., ordinances numbered 89191 and 89193. Ordinance No. 89191 amends article 78 of the

License and Business Code of the city of Portland. It defines "retail merchant", *and imposes on every person engaged in the occupation of retail merchant* in the city of Portland *an annual license fee* of $25, *plus* "$1.00 on each $1000.00 of gross sales of such business *in excess of $25,000.00* during the calendar year *preceding the year for which the license is issued*". Ordinance No. 89193, which amends article 105 of said code, defines "wholesale merchant", and then imposes *on every person engaged in that occupation,* an annual license fee of $25, plus 75¢ on each $1,000 of gross sales of such business *in excess* of $30,000 *during the calendar year preceding.* (Italics ours.) The foregoing ordinances are typical of all the others adopted at or about the same time.

It is to be observed first that the license tax imposed by these ordinances is directly against the person engaging in the particular business. It is clearly an occupation tax levied for the privilege of transacting business. *It is not a tax upon the business, nor is it a tax upon income; neither is it a sales tax.* The gross sales of the business in excess of certain specified sums are simply used as the yardstick by which the total license tax is fixed. The established tax under Ordinance 89191 is $25, and that tax has no reference to receipts from sales. Whether, under this ordinance, the licensee pays a higher fee depends upon whether gross sales exceeded $25,000 during the preceding year. The license tax is paid at the beginning of the year and in one lump sum, and it is the direct obligation of and is paid by the licensee. *The city of Portland has no interest in nor claim against the gross receipts of the business.* If, at the commencement of the license year, the person engaged in the business does not apply for his license, there is no tax to be paid, no matter

what the gross receipts of his business may have been for the calendar year immediately preceding. If the applicant for a license is opening a new business, he merely pays $25 for his license, and that amount is not increased for that year, even though his gross receipts during the year may far exceed the sum of $25,000. The foregoing observations establish the clear distinctions to be drawn between the Portland ordinances and the Eugene ordinance.

It must also be noted that, when these Portland ordinances were before this court, the question now under discussion in the instant litigation was not directly or indirectly referred to or decided. Taking both cases in which those ordinances were considered, the only contentions made and ruled upon were:

1. That the ordinances were in violation of the city charter and void on the ground that they contain another subject different from and not germane to the subject of the original ordinance which they are stated by their titles to amend;

2. That the court erred in failing to find that the practical denial of the opportunity for the people to invoke the referendum against the 22 ordinances rendered the same unconstitutional and void;

3. That the court erred in failing to find that the 22 ordinances sought to levy taxes in excess of the 6 per cent limitation imposed by art XI, § 11, of the constitution of the state of Oregon and in failing to find that by reason thereof the said 22 ordinances are unconstitutional and void;

4. That the court erred in failing to find that the tax levied and imposed by the 22 ordinances is not uniform but is discriminatory, in violation of art I, §§ 20 and 32, also art IX, § 1 of the state constitution and Amendment XIV to the United States Constitution and therefore void;

5. That the court erred in not holding that ordinances No. 89191 and No. 89193 taken in conjunction with the other ordinances were too vague and ambiguous to be enforced.

The court ruled adversely to all these contentions made by the licensees, upholding the validity of the ordinances. There was no dissenting opinion in either case.

Respecting the contention that the ordinances were not uniform, but discriminatory, and therefore unconstitutional and void, the court, at page 191 of 188 Or, quoted extensively and with approval from the case of *Carmichael v. Southern Coal Co.*, 301 US 495, 81 L ed 1245, 57 S Ct 868, and then said:

"The uniformity exacted in the imposition of an excise tax is geographical, not intrinsic. Under the equal protection clauses of the state and federal constitutions the state is not confined 'to a formula of rigid uniformity in framing measures of taxation.' It 'may tax some kinds of property at one rate, and others at another, and exempt others altogether', and it 'may lay an excise on the operations of a particular kind of business, and exempt some other kind of business closely akin thereto.' Steward Machine Co. v. Davis, supra (301 U. S. at pp. 583, 584), and the cases therein cited. * * *"

It is unnecessary for us to discuss the decision in *Lent v. City of Portland* as regards the matter now being considered, because it does not add anything to what was held in the Garbade and Boynton, and Barnard Motors cases.

In Banger's Appeal, 109 Pa St Rep 79, 95, the court said:

"An 'occupation' tax is peculiar in its character. It is not a tax upon property, but upon the pursuit

which a man follows in order to acquire property and support his family. It is a tax upon income in the sense only that every other tax is a tax upon income; that is to say, it reduces a man's clear income by the precise amount of the tax. But it is an income tax in no sense. * * *"

In *U. S. v. Philadelphia*, B. & W. R. Co., 262 F 188, 190, the court pointed out the distinction to be drawn between an occupation (excise) tax and an income tax. It said:

"* * * There is, of course, a fundamental difference between an income tax and an excise tax, both with respect to what is taxed *and the source of the power to tax.*

"We are concerned wholly with an excise tax. Whether it is a scientifically accurate concept of it or not, the concept of it as a charge for the privilege of following an occupation or trade, or carrying on a business, gives us a fairly good working idea of what it is. It is, in consequence, *an indirect tax,* and has no reference to earnings or income, except that the sum of such earnings or income may (as anything else may) be made the measure of the tax. *An income tax,* on the contrary, *is a direct tax imposed upon the thing called income,* and is as directly imposed as is a tax on land." (Italics ours.)

If we were to ignore entirely the provisions of § 5 of the ordinance, the final result would be the same. In that case we would be confronted with a direct levy of three per cent against the gross income of plaintiffs' businesses. The levy would amount to an income tax. The city of Eugene has no more power to levy an income tax than it does to impose a sales tax.

Before concluding, we make one further observation respecting the taxing features of this Eugene

ordinance. As we have repeatedly stated, an occupation tax is one imposed upon persons for the privilege of conducting their established trades, occupations, or businesses. But this tax is imposed and collected on admissions to every show or entertainment without regard to the business or occupation of the person conducting the same. For example, it would be collected upon all admissions to an entertainment given by the Ladies' Aid Society, the American Legion, the Elks Lodge, or any other nonprofit club or society. Obviously, these nonprofit organizations are not engaged in the business or occupation of conducting amusements, so the tax as applied to shows, etc., conducted by them could hardly be regarded as an occupation tax. Yet they, like the owners and operators of established theaters, are required to collect and hold in trust for the city the three per cent tax on admissions. This further establishes the true nature of the tax imposed.

In the light of what has been said, it follows that the charter of the city of Eugene does not vest that city with the power to levy a tax such as it seeks to impose by Ordinance 9117. Therefore, that part of the ordinance which provides for a three per cent tax upon the total of admission charges is void and unenforcable.

The decree of the trial court is reversed and this cause remanded with directions to enter a decree holding that part of the ordinance providing for a three per cent tax upon the total admission charges to be void and unenforcable, and enjoining the enforcement thereof against plaintiffs.

Neither party shall recover costs.

## LUSK, J., SPECIALLY CONCURRING.

I agree with the result reached in this case solely for the reason that I am unable to reconcile the claim of the city that this is an occupation tax, with the provisions of §§ 5 and 6 of the ordinance. A sales tax statute, which imposes a direct obligation on the retailer, may be a tax upon the retailer and not the consumer, and sustainable as a tax on the privilege of doing business. *Western Lithograph Co. v. State Board of Equalization,* 11 Cal2d 156, 78 P2d 731, 117 ALR 838. But the difficulty with the Eugene ordinance is that no personal obligation of the theater's proprietor arises until he has violated the trust imposed on him by § 5. That section clearly would seem to mean, as the court holds, that three per cent of the moneys collected from the sale of tickets never becomes the property of the theater proprietor, who is simply made a collecting agent for the city. If that be so, then the city has attempted to impose this three per cent tax on the consuming public. This, I agree, it has no authority to do.

I do not agree, as the opinion suggests, that if § 5 were disregarded this would be an income tax, or that the municipality may not lawfully impose an occupation tax measured by a percentage of current revenues and payable at the end of each month, rather than one graduated according to income earned in a previous year, as in the case of the Portland occupation tax ordinances recently sustained by us. *Barnard Motors v. City of Portland,* 188 Or 340, 215 P2d 667; *Garbade and Boynton v. City of Portland,* 188 Or 158, 214 P2d 1000. The courts will not interfere with the legislative determination of the method by which the amount of a license tax is arrived at so long as it is not unreasonably

discriminatory. 33 Am Jur, Licenses, 369, § 46; *State ex rel Griffin v. Green,* 104 Mont 460, 67 P2d 995, 111 ALR 770. In the case just cited a legislative act imposed a license tax on operators of all moving picture theaters of one and one-fourth per cent of the gross proceeds from the sale of tickets of admission in excess of $3,000 per quarter. The fact that the tax was payable quarterly, and that it was measured by a percentage of the "actual receipts from the sales," instead of being graduated in amount, did not prevent the court from holding that it was a license tax imposed for the privilege of doing business. The gross proceeds were said to be "simply the measuring stick by which the amount of the license tax is determined," and the court held that it was without authority to interfere with the legislative determination in that regard. See, also, *Home Insurance Co. v. New York,* 134 US 594, 10 S Ct 593, 33 L ed 1025.

I concur in the result.